**MIDWAY AIRLINES, INC., Plaintiff,**

**United States of America, Elizabeth Hanford Dole, Secretary of Transportation, and Michael J. Fenello, Deputy Administrator of the Federal Aviation Administration, Plaintiffs-Intervenors,**

v.

**COUNTY OF WESTCHESTER, NEW YORK, Andrew P. O'Rourke, County Executive, and Westchester County Board of Legislators, Defendants.**

**No. 84 Civ. 2229.**

United States District Court, S.D. New York.

April 19, 1984.

RI, 1983); *Winkes v. Brown University,* 32 FEP Cases 1041 (1983); *Serpe v. Four Phase System,* 33 FEP Cases 169 (ND California, 1982).

David B. Armstrong, Chicago, Ill., Joel Stephen Burton, Robert L. Deitz, Alfred J. Eichenlaub, Ginsburg, Feldman & Bress, Chartered, Washington, D.C., Richard P. Caro, Schlam, Stone, Caro & Dolan, New York City, for plaintiff.

Nancy Kilson, Asst. U.S. Atty., Kenneth N. Weinstein, Deputy Asst. Gen. Counsel for Litigation, U.S. Dept. of Transp., Washington, D.C., for plaintiffs-intervenors.

Henry J. Logan, Westchester County Atty., Marilyn J. Slaatten, Deputy County Atty., Lesley F. Levine, Sr. Asst. County Atty., Andrea L. McArdle, Asst. County Atty., Brian J. Powers, Asst. County Atty., White Plains, N.Y., for defendants; Samuel S. Yasgur, White Plains, N.Y., of counsel.

EDWARD WEINFELD, District Judge.

This is another lawsuit involving the Westchester County Airport.[1] The issue now before this Court is a motion by plaintiff, Midway Airlines, Inc. ("Midway"), for a forthwith mandatory injunction that would require the County of Westchester ("the County"), Westchester County Executive Andrew P. O'Rourke ("O'Rourke"), and the Westchester County Board of Legislators ("the County Board"), the defendants herein, to provide immediate "access to the Westchester County Airport" for Midway's proposed scheduled flights between Midway Airport in Chicago and the Westchester airport. Midway's application for such immediate and drastic relief is supported by the plaintiff-intervenors, the United States of America, the Secretary of Transportation, and the Deputy Administrator of the Federal Aviation Administration.[2]

Apart from the litigants, various other parties may be affected by the disposition. These include other carriers, which, under law, have equal rights of access to the airport facilities, residents of the immediate area who have, over the years, been concerned with noise abatement and other environmental problems, corporate jet owners and others who use the landing and navigational facilities, as well as passengers who regularly avail themselves of the services provided by the airport and its scheduled carriers. Defendants, who have an obligation to protect the health, welfare, and safety of the County's inhabitants, as well as a legal duty not to discriminate unjustly against any carrier seeking to use the facilities, vigorously oppose the motion pending completion of a currently ongoing study of the myriad of problems raised by conflicting demands upon the airport facilities.

In addition to forthwith injunctive relief, Midway seeks a permanent injunction and monetary relief to redress defendants' alleged "unlawful refusal to allow Midway access to Westchester County Airport." Generally, the complaint alleges that defendants have violated no fewer than three federal statutes enacted to promote competition in the market for interstate commercial air travel,[3] the Civil Rights Act of

---

1. At least three prior federal actions are chronicled by Judge Robert J. Ward of this Court in *United States v. County of Westchester*, 571 F.Supp. 786, 791 (S.D.N.Y.1983).

2. Upon the argument, the motion of the United States, Secretary of Transportation, and Deputy Administrator of the Federal Aviation Administration seeking leave to intervene, being unopposed, was granted. *See* Fed.R.Civ.P. 24(b)(2);

*see also* 49 U.S.C. § 1354(a) (1976 & Supp. V 1981) (authority of Administrator); *id.* § 2218 (authority of Secretary).

3. Midway's complaint alleges defendants have (1) failed to make Westchester County Airport "available for public use on fair and reasonable terms and without unjust discrimination," in violation of 49 U.S.C. § 2210(a) (West Supp. 1983) (superseding 49 U.S.C. § 1718 (1976)); (2)

1871,[4] and the Sherman Antitrust Act.[5] The intervenors also seek permanent injunctive relief, and base their complaint upon the Supremacy Clause of the Constitution,[6] various contractual rights arising out of grant agreements between the Secretary of Transportation and defendants,[7] as well as the aviation statutes relied upon by Midway.

The instant dispute arises from a February 17, 1984, request by Midway's president and chief operating officer, Neal F. Meehan, that O'Rourke notify Midway within five days of the County's determination whether to grant Midway permission to schedule "Part 121 air carrier service," consisting of three flights each weekday[8] and three flights each weekend[9] between Westchester County Airport ("HPN") and Midway Airport, and O'Rourke's reply on February 23, 1984, that the County Board, as the proprietor of HPN, would render no decision on Midway's application pending a "review of policies and guidelines with respect to [a]irport operations."

The affidavits of various Midway and County officials establish that at the time of O'Rourke's announcement, HPN was served by three "Part 121 air carriers": United Air Lines, Air Florida, and Empire. Like Midway, these airlines are "certificat-

ed" by the Federal Aviation Administration to provide interstate passenger service and, as opposed to "commuter carriers," are authorized to use aircraft with a maximum capacity in excess of thirty seats or 7,500 pounds.[10] With the permission of the County Board, the three incumbents scheduled a total of eight flights daily to and from HPN. United, the only of the three offering service to Chicago, had applied for permission to use airport facilities on October 6, 1983, and was given final permission by the County Board on December 15, 1983, to schedule a maximum of two flights daily.[11] The eight Part 121 air carrier flights, including United's, continue to land and depart each day.

The County Board uses a two-step procedure in approving applications for airport use. First, there is a technical review by the airport manager to ensure that needed arrangements for ground services are made, coordination of air schedules is accomplished, and noise limitations and other requirements are met; upon successful completion of such review, the application is forwarded to the County Executive and the County Board for final approval.[12] Midway invoked this process on December 6, 1983, when it notified airport officials of

granted an "exclusive right for the use of a[ ] landing area or air navigation facility upon which Federal funds have been expended," in violation of 49 U.S.C. § 1349(a) (West Supp. 1983); and (3) enacted or enforced a "law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of an[ ] air carrier having authority ... to provide interstate air transportation," in violation of 49 U.S.C. § 1305(a)(1) (1976 & Supp. V 1981).

**4.** 42 U.S.C. § 1983 (1976 & Supp. V 1981).

**5.** 15 U.S.C. § 1 et seq. (1976).

**6.** U.S. Const. art. VI, cl. 2.

**7.** See 49 U.S.C. § 2210 (West Supp.1983); 14 C.F.R. § 152 App. D(II)(19) (1983); Plaintiff Intervenors' Exhbt. A.

**8.** Midway's proposal actually entails four departures and four arrivals each day. The extra departure and arrival was necessary to move Midway's aircraft from Westchester to Newark

International Airport for overnight parking, because suitable parking was not available at Westchester. See Affidavit of George Niemeyer, Exhbt. 10.

**9.** In each weekend period Midway proposes to schedule three departures from Westchester to Chicago and three arrivals from Chicago. In addition, on Saturday an additional landing would take place because of the need to move the Midway aircraft from Newark to Westchester. On Sunday, an additional departure would take place in order to move the aircraft from Westchester to Newark. See id.

**10.** See 14 C.F.R. § 121.1(a)(5)(ii) (1983); see also id. § 135.1 (commuter carrier limits).

**11.** Prior to United's initiation of service to Chicago in December, 1983, Air Florida had provided Part 121 air carrier service to Chicago in 1980 and 1981.

**12.** Affidavit of Samuel F. Smith III [hereinafter cited as Smith Aff.] at ¶ 31.

its desire to initiate Part 121 air carrier service at HPN on March 1, 1984,[13] with the schedule of flights noted above. At the time Midway applied, it had no arrangements for passenger service, ticketing, ground handling, or overnight parking of its aircraft. In addition, Midway's departure schedule violated the airport's "30 minute" rule, which prohibits more than one Part 121 air carrier departure each half hour. These technical problems were not fully resolved, and hence Midway's application was not ripe for decision by the County Board, until February 21, 1984.

As Midway's Director-Properties and Facilities, George L. Niemeyer, acknowledged in his affidavit, Midway's scheduled service would impose additional burdens on what was at HPN already "limited terminal space available for the processing of passenger traffic and the limited parking area for the ... aircraft ... Midway w[ould] be using." HPN Manager Samuel F. Smith III's affidavit amplifies the specific crowding problems: there is only one small terminal equipped to handle flights by Part 121 air carriers;[14] during peak hours of 7:00 a.m. to 9:00 a.m. and 5:00 p.m. to 7:00 p.m. on week nights "so many passengers are currently booked on departing flights that it is often impossible *to even enter* the building"; at such times there are "lines extending from ticket counters out into the street"; and the situation is even worse in holiday periods.[15] At least one of Midway's proposed scheduled flights, if approved, would depart during peak hours.

Midway's application was only one expression of the increased interest by commercial air lines in serving the Westchester airport. According to airport manager Smith, within the past year "and particularly since August, 1983," such interest "increased dramatically." By December, 1983, no fewer than seven Part 121 air carriers, including United, and ten commuter air carriers, had expressed interest in initiating new service to Westchester. United and Precision Airlines, a commuter air carrier seeking to use the same terminal used by the Part 121 air carriers, had filed formal applications to initiate new service. And, as noted, on December 6, 1983, Midway first expressed its desire to schedule service.

In December 1983—the record does not indicate a precise date—the County Board recognized that the situation required an informed study in order to establish rational guidelines for ruling upon pending and future applications for the use of scarce airport capacity. The evident need for essential information in view of the increased demand for use of the airport, and its ensuing problems, led the County to suspend the processing of applications that appeared ripe for decision by the County Board.[16] It was manifest that if the County was to observe its statutory duties with respect to use of the airport, information was required to establish criteria and standards in light of the ever increasing number of applications. On January 30, 1984, the County Board engaged the services of an airport consultant to develop a "comprehensive and complete statement of ... policy for the airport," which is expected to be forthcoming within a short period. The County Board asserts it will be able, upon receipt of the report, to promulgate interim rules for assessing then-ripe applications, including Midway's, within four weeks. If it is determined that the airport is at or above capacity, a method will be devised for fairly allocating the available flight slots amongst all competing applicants, in-

---

**13.** Midway's first act to seek approval from local authorities apparently did not come until December 9, 1983. *See* Affidavit of George L. Niemeyer, Director-Properties & Facilities, Midway Airlines, Exhbt. 1.

**14.** For example, flights by Part 121 air carriers are subject to special security requirements. *See* 14 C.F.R. § 108.5(a)(1) (1983). Part of the burden of ensuring security for such flights is explicitly allocated to the airport operator. *See id.* § 107.3(b).

**15.** Smith Aff. at ¶ 17 (emphasis in original).

**16.** Affidavit of Samuel S. Yasgur, Apr. 4, 1984, at ¶ 9(A).

cluding both incumbents and those seeking to initiate new service.

Since the implementation of the County's decision to defer final decision upon pending applications, other·carriers, in addition to Midway, have had their applications for access to HPN deferred. In particular, decision on the application of Precision Airlines, which passed through the technical review on March 30, 1984, has been treated exactly as has that on Midway's: it has been deferred. The application of another commuter airline, Colgan Airways, which seeks to expand existing service, has also been deferred. That of American Airlines, a Part 121 air carrier, is not ripe for final decision by the County Board because American's proposed aircraft exceed existing operational limitations set by the County, and, accordingly, the application has not passed through the technical review phase. At the same time, however, no action has been taken on a request by American to the County that the operational limitations be waived.

## DISCUSSION

The standard in this Circuit for the granting of preliminary relief is well known. As our Court of Appeals recently reiterated:

> To be entitled to a preliminary injunction, ... [movant] must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." [17]

In light of the facts noted above, and after a thorough review of the voluminous memoranda and the arguments of counsel, the Court concludes that under this standard neither Midway nor the intervenors are entitled to preliminary relief at the present time.

At the outset, it must be emphasized that Midway's application for use of HPN facilities has not been denied. It has been deferred pending completion of the consultant's study and the promulgation of interim rules, referred to above. O'Rourke unequivocally assured Midway that its application was only being held in abeyance and it is apparent that the County Board's decision to suspend the processing of applications ripe for its review is motivated by concerns for the safety of passengers in the overcrowded HPN terminal.

The defendants are fully cognizant of their duty under the federal aviation laws to make their facility open to air carriers on fair and reasonable terms and without unjust discrimination, the requirement that they may grant no "exclusive right" to conduct a particular aeronautical activity, as well as the prohibition on local regulation of rates, routes, or services of certificated air carriers. However, no federal law prohibits Westchester County, on the record presented, from temporarily refusing to grant additional access to HPN pending a reasonable period during which the County may study the status quo arrangement and develop rational and nondiscriminatory rules for allocating scarce space and landing and takeoff slots, consistent with local environmental and safety needs. Quite to the contrary, federal law recognizes the traditional authority of local governments to regulate airport usage by the "exercise of [their] proprietary powers and rights." [18] As our Court of Appeals

---

17. *United States v. State of New York,* 708 F.2d 92, 93 (2d Cir.1983) (*quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)), *cert. denied,* —— U.S. ——, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984); *see Arthur Guinness & Sons, PLC v. Sterling Pub. Co.,* 732 F.2d 1095 at 1099 (2d Cir.1984).

18. 49 U.S.C. § 1305(b) (1976 & Supp. V. 1981). The legislative history is unmistakeably clear that Congress did not intend that the preemptive force of 49 U.S.C. § 1305(a)(1) would interfere with "long·recognized powers of the airport operators to deal with noise and·other environmental problems at the local level." 124 Cong. Rec. 37419 (1978) (remarks of Sen. Kennedy). The other federal aviation statutes relied upon by Midway and plaintiff intervenors must be construed in light of Congress' recognition of the legitimate needs of local airport proprietors to ensure the safety of passengers while on the

has held, nothing prohibits a local airport operator from issuing "reasonable, nonarbitrary and nondiscriminatory rules defining the permissible level of noise [or other level of danger] which can be created by an aircraft using the airport."[19] The Court has also held that local governmental airport proprietors are entitled to a "reasonable" period in which to develop such criteria.[20] There is no well founded allegation in the record that the defendants have unreasonably delayed the promulgation of such regulations.[21] Accordingly, were a trial held today neither Midway nor the intervenors would be substantially likely to succeed. Nor do the equities tip decidedly toward the parties requesting relief. It may be assumed that the addition of Midway to the list of carriers serving HPN would increase the competition for passenger patronage along certain interstate routes. But competition is not the only interest that Congress intended to promote in enacting the various statutes relied upon by the movants.[22] The County is acting responsibly in seeking to protect the safety of passengers and others who use the facilities at the airport. The County is therefore entitled to a fair opportunity to complete its study, which will enable it to consider not only Midway's application but also those of other carriers seeking to avail themselves of the airport facilities.

The defendants, as noted, are entitled only to a reasonable period in which to conduct their study and implement rational, nondiscriminatory rules governing airport access. After reviewing the proposed timetable submitted by the County Board, the Court orders that:

(1) defendants shall conclude the study of usage at HPN within 30 days of date;

(2) within 20 days thereafter the County Board shall promulgate rational and nondiscriminatory rules governing the allocation of ground facilities and flight slots to Part 121 air carriers authorized by federal law to serve HPN.

ground. *See, e.g.,* 40 Op.Att'y Gen. 71, 73 (1941) (That section 303 of the Civil Aeronautics Act, the predecessor to 49 U.S.C. § 1349(a), does not permit the granting of an exclusive right to conduct a particular aeronautical activity at an airport "does not mean that in administering the provisions of section 303 it is necessary to permit such competition as would endanger the safety of the public and of persons engaged in air commerce."). To the extent Midway relies on the Sherman Act and § 1983, it cites no authority in support of its claims thereunder, and the Court need not consider the applicability of these statutes. *See* Local Civil Rule 3(b).

**19.** *British Airways Bd. v. Port Authority of New York,* 564 F.2d 1002, 1011 (2d Cir.1977) ("Concorde II"). In a recent decision addressing the issue of noise limitations and aircraft specifications, an area in which the federal government has intruded to a much greater extent than the sphere at issue here, air terminal congestion, our Court of Appeals rejected the proposition that "a regulation of the permissible level of noise is limited to controlling the decibel level of individual takeoffs and landings and may not seek to limit cumulative noise exposure." *Global Int'l Airways Corp. v. Port Authority of New York,* 727 F.2d 246 at 250 (2d Cir.1984).

**20.** *British Airways Bd. v. Port Authority of New York,* 558 F.2d 75, 86 (2d Cir.1977) ("Concorde I").

**21.** In addition, there is no basis, on the facts presented, for asserting that the County's decision to suspend consideration of Part 121 air carrier applications was enforced in an unjustly discriminatory manner. Whether United was granted permission to schedule service prior to the County's decision to defer consideration of all future applications, or was granted an exemption from the deferral policy, Midway can make no claim of unjust discrimination because its application was not ripe for consideration by the County Board until two months after the decision on United had been made. A temporary deferral of decisions on pending applications, which *is* lawful, will always discriminate against latecomers. Only if the discrimination is in favor of an equally late or later applicant is the discrimination unjust. To require immediate reallocation of existing flight slots and ground facilities upon the technical qualification of each and every non-incumbent airline would create havoc and make it impossible for local authorities to study the status quo in a rational manner.

**22.** *See, e.g.,* 49 U.S.C. § 1302(a)(6) (Supp. V. 1981) (deference to "regional airport plans of regional and local authorities").

**442**

The foregoing order shall bind defendants, their agents, officers, directors, employees, representatives, and all persons acting in concert or otherwise participating with them with actual knowledge of this order.

The motions for preliminary relief are denied without prejudice to their renewal in the event the defendants fail to adhere to the schedule outlined herein, or, upon promulgation of lawful rules, to provide access to Midway or any other party entitled thereto.

So ordered.