**WESTERN AIR LINES, INC., Plaintiff,**

v.

**PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Defendant.**

No. 86 Civ. 6259 (JMC).

United States District Court, S.D. New York.

Sept. 3, 1986.

Roger M. Deitz, New York City, for plaintiff.

Patrick J. Flavey, New York City (Arthur P. Berg, Jay Adlai Selcov, of counsel), for defendant.

## OPINION

CANNELLA, District Judge:

After a nonjury trial on the merits, plaintiff's claims for preliminary and permanent injunctive relief are dismissed. Fed.R. Civ.P. 65(a)(2).

## FACTS

Plaintiff Western Airlines ["Western"] brings this action against defendant Port Authority of N.Y. & N.J. ["Port Authority" or "Port"], seeking preliminary and permanent injunctive relief against enforcement by the Port of its so-called perimeter rule. The undisputed facts are as follows.

Western is the holder of several slots at LaGuardia Airport ["LaGuardia"]. Each slot permits Western to conduct one landing or takeoff operation during a 30–minute period. Western obtained these slots in a lottery conducted by the Federal Aviation Administration ["FAA"] on March 27, 1986 and will lose them unless it commences service at LaGuardia by September 17, 1986.

Western maintains its hub in Salt Lake City. The hub permits the airline to serve city pairs by one stop or connecting flights when such city pairs cannot be served economically on a point-to-point nonstop basis. Western intended to begin operating three daily nonstop flights in each direction between LaGuardia and Salt Lake City on September 3, 1986.

The Port Authority operates Kennedy International Airport ["Kennedy"], LaGuardia, and Newark International Airport ["Newark"]. Since the late 1950's, the Port has had a perimeter rule at LaGuardia, which forbids airlines using LaGuardia to run nonstop flights beyond a set distance. The stated purpose of the rule is to reduce ground congestion and maintain LaGuardia as a short and medium haul airport by diverting longer haul air traffic to Kennedy and Newark. Of the three airports operated by the Port, LaGuardia is the smallest with 662 acres, followed by Newark with 2300 acres, and Kennedy with 4930 acres. Neither Newark nor Kennedy is subject to a perimeter restriction.

Prior to 1984, the perimeter rule at LaGuardia was an informal one, prohibiting most international operations, and nonstop operations in excess of 2000 miles. In 1984, the Port Authority set in place a formal rule, which reduced the permissible distance for nonstop operations to 1500 miles. The new rule does permit flights to Denver, although Denver is more than 1600 miles from LaGuardia. According to the Port Authority, Denver was "grandfathered" under the new rule because there had been continuous nonstop service between LaGuardia and Denver since 1981 and that service accounted for a significant portion of LaGuardia operations. At the

time the rule was adopted, three air carriers operated LaGuardia-Denver service.

Salt Lake City is located almost 2000 miles from LaGuardia. Western now serves Salt Lake City with two daily round-trip flights at Kennedy. Because Western believes that LaGuardia serves a lucrative business market, it has sought permission from the Port Authority, in May 1985 and again in early 1986, to conduct New York-Salt Lake City operations from LaGuardia. The Port has denied permission on the basis of the perimeter rule.

In this action, Western alleges that the perimeter rule violates various federal aviation statutes [1] and the Civil Rights Act of 1871,[2] and is invalid under the Supremacy,[3] Equal Protection,[4] Due Process,[5] and Commerce [6] clauses of the United States Constitution. On August 19 and September 2, 1986, the Court held a full hearing on the merits, consolidating plaintiff's claims for preliminary and permanent injunctive relief pursuant to Fed.R.Civ.P. 65(a)(2). For reasons that follow, Western's claims are dismissed.

## DISCUSSION

Western's principle contentions center on three federal aviation statutes: Section 105(a)(1) of the Deregulation Act, 49 U.S.C. § 1305(a)(1) ["Section 1305(a)(1)"]; the Airport & Airway Improvement Act, 49 U.S.C. § 2210 ["Section 2210"]; and the Federal Aviation Act of 1958, 49 U.S.C. § 1349(a) ["Section 1349(a)"]. Section 1305(a)(1) is a preemption statute. It provides:

[N]o State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier having authority under subchapter IV of this chapter to provide air transportation.

Sections 2210 and 1349(a) respectively require that an airport proprietor receiving federal funds (1) make its facilities available to the public on fair and reasonable terms and without unjust discrimination, and (2) not grant to any air carrier an exclusive right to use the facilities.

Western contends that the perimeter rule violates Section 1305(a)(1) and thus the Supremacy Clause because the rule is a regulation of Western's "routes and services". Western also argues that the rule impermissibly discriminates against Western in violation of the Commerce Clause and Sections 2210 and 1349(a) because it permits flights to Denver but not to Salt Lake City. Finally, Western asserts that the rule places an undue burden on interstate commerce.[7]

The Port Authority argues that Western has failed to state a cause of action. It points to *Montauk-Caribbean Airways v. Hope*, 784 F.2d 91 (2d Cir.1986), which held that neither Section 1305(a)(1) nor 1349(a) confers a private right of action, and implied the same for Section 2210.[8] Western claims that even if it has no private action

---

1. 49 U.S.C. §§ 1305(a)(1), 1349(a), 2201 *et seq.*

2. 42 U.S.C. § 1983.

3. U.S. Constitution, Art. VI, cl. 2.

4. U.S. Constitution, Amendment XIV.

5. *Id.*

6. U.S. Constitution, Art. I, Sect. 8, cl. 3.

7. Western makes no argument with respect to its claims under the Civil Rights Act or the Equal Protection & Due Process clauses and the Court does not consider these claims. *See* Local Civil Rule 3(b); *see also Midway Airlines v. County of Westchester*, 584 F.Supp. 436, 441 n. 18 (S.D.N.Y.1984).

8. The Court did not address the issue with respect to Section 2210, but affirmed the district court's dismissal of that claim. It also cited favorably to *Hill Aircraft & Leasing Corp. v. Fulton County*, 561 F.Supp. 667, 673 (N.D.Ga. 1982), *aff'd*, 729 F.2d 1467 (11th Cir.1984). In *Hill Aircraft* the court considered both Section 1349(a) and Section 1718, 49 U.S.C. § 1718, the predecessor to Section 2210. The court concluded there to be no private right of action under either section. Subsequently, the Eleventh Circuit, which had affirmed the district court's opinion in *Hill Aircraft*, squarely addressed Section 2210, and held there to be no private right of action. *See Arrow Airways, Inc. v. Dade County*, 749 F.2d 1489, 1490–91 (11th Cir.1985).

under the statutes it may still sue to invalidate the perimeter rule under the Supremacy Clause. In this respect, Western maintains, the statutes demonstrate the preemptive force of federal legislation in the area of aviation. The Port Authority responds that such an argument merely circumvents the rule in *Montauk* and, if adopted, would render that decision meaningless.

The Court finds the Port Authority's argument unpersuasive and contrary to the *Montauk* decision itself. In *Montauk,* the plaintiff sought to operate as a fixed-base operator and air carrier on a year-round basis at an airport owned by the Town of East Hampton. Pursuant to a lease with the Town, the plaintiff was limited to seasonal operations. Plaintiff sought to modify the lease but the Town denied its request. Plaintiff then challenged the Town's actions both under the federal aviation statutes at issue here and on antitrust grounds.

The district court dismissed the complaint. On appeal, the Second Circuit rejected the claims under the Sherman Act. The court reasoned that N.Y.Gen.Mun.Law § 352, which permits municipal airport operators to enter into exclusive lease arrangements, constitutes a clearly expressed state policy authorizing municipalities to pursue anticompetitive activity. Consequently, the court held, the Town was immune from the antitrust challenge by virtue of the state action doctrine.

The plaintiff then argued that Section 1305(a) preempted state law in this area and thus there was no state authorization for the anticompetitive activity. The court rejected this argument, but on the merits, holding that the Town's actions fit an exception to Section 1305(a) preemption. *See* 784 F.2d at 96–97. The court therefore drew a distinction between a Supremacy Clause challenge and a private right of action. *See also New York Airlines v. Dukes County,* 623 F.Supp. 1435 (D.C. Mass.1984) (distinguishing private cause of action from a Supremacy Clause challenge).

■ This Court concludes that *Montauk* does not foreclose Western's Supremacy Clause challenge to the extent that it relies on Section 1305(a)(1) preemption. However, the Court finds no support for such a challenge in Sections 1349(a) or 2210. Unlike Section 1305(a)(1), which renders void as preempted any regulation affecting "routes or services" not contemplated by that section, Sections 1349(a) and 2210 merely impose obligations on airport proprietors.[9] Although these sections may have some relevance in demonstrating the extent of federal preemption,[10] Western's attempt to establish a violation of these sections amounts to a private right of action, which is not permitted.

Turning to Western's Supremacy Clause challenge, Section 1305(a)(1), as previously noted, establishes federal preemption in the field of "rates, routes and services" of air carriers. The Port Authority's perimeter rule may be fairly characterized as a regulation touching this area and the Port advances no significant arguments to the con-

---

**9.** It is difficult to see how Section 1305(a)(1) could give rise to a cause of action when that section creates no rights or obligations.

**10.** The supremacy clause, U.S. Const., art. VI, cl. 2, invalidates state laws that "interfere with or are contrary to" federal law. *Gibbons v. Ogden,* 9 Wheat. 1, 211, 6 L.Ed. 23 (1824). Congress may preempt state law by an express provision. *Jones v. Rath Packing Co.* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, *reh'g denied,* 431 U.S. 925, 97 S.Ct. 2201, 53 L.Ed.2d 240 (1977). In addition, an intent to preempt state law may be inferred where Congress has enacted a sufficiently comprehensive scheme of federal regulation or where the federal interest is dominant so as to preclude state legislation in the same area. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *see Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Where Congress has not acted to supersede completely regulation by the states, state law is nullified to the extent that it conflicts with federal law. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 141–43, 83 S.Ct. 1210, 1216–18, 10 L.Ed.2d 248, *reh'g denied,* 374 U.S. 858, 83 S.Ct. 1861, 10 L.Ed.2d 1082 (1963). *See generally Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). *New York Airlines v. Dukes County,* 623 F.Supp. 1435, 1441 (D.C.Mass.1985).

trary. The Port does argue that its perimeter rule is nonetheless valid under Section 1305(b)(1), 49 U.S.C. § 1305(b)(1) ["Section 1305(b)(1)"], which provides:

> Nothing in subsection (a) of this section shall be construed to limit the authority of any State or political subdivision thereof or any interstate agency or other political agency of two or more States as the owner or operator of an airport served by any air carrier certificated by the Board to exercise its proprietary powers and rights.

The extent of "proprietary powers and rights" has not as yet been established. The legislative history of Section 1305(b)(1) indicates that the airport proprietor would be permitted to take those actions "presently accepted as valid exercises of proprietary powers." 124 Cong.Rec. 18799 (remarks of Sen. Kennedy). The issue has most frequently arisen in the context of noise regulations.

In *City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), the Court struck down a municipal ordinance which imposed a curfew on jet air traffic at a local airport. The Court focused on Section 611 of the Federal Aviation Act, 49 U.S.C. § 1431, which, as the Court put it, represents a "comprehensive scheme of federal control of the aircraft noise problem." *Id.* at 629, 93 S.Ct. at 1857. The Court ruled the ordinance preempted due to the "pervasive nature of the scheme of federal regulations of aircraft noise." *Id.* at 633, 93 S.Ct. at 1859. Expressly left open, however, was the question whether there is any limitation on an airport proprietor's ability to regulate noise. *See id.* at 636 n. 14, 93 S.Ct. at 1861 n. 14. In this respect, the Court noted a letter by the Secretary of Transportation, quoted with approval in the Senate Report on Section 611, which expressed the view that

> The proposed legislation will not affect the rights of a State or local public agency, *as the proprietor of an airport,* from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft

using the airport. Airport owners *acting as proprietors* can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory. *Id.* at 635, 93 S.Ct. at 1861 (emphasis in original).

Several courts that have since considered the viability of the proprietor exception alluded to in *City of Burbank* have held such an exception to exist. *See, e.g., Santa Monica Airport Ass'n v. City of Santa Monica,* 659 F.2d 100, 103 (9th Cir.1981); *British Airways Bd. v. Port Authority,* 558 F.2d 75, 83 (2d Cir.1977). In *British Airways Bd.,* our Court of Apeals upheld the Port Authority's temporary ban on SST flights at Kennedy Airport pending the promulgation of reasonable regulations establishing acceptable noise levels for the airfield. The court relied on the legislative history of Section 611, in particular the history cited to in *City of Burbank,* and concluded that it was Congress' intent to permit proprietor regulations in the field of noise, despite the otherwise total federal preemption in this area.

The court also indicated limits on an airport proprietor's power. It said that the proper domain of the airport proprietor is to establish regulations regarding "the permissible level of noise which can be created by aircraft using the airport." 558 F.2d at 84. In a subsequent decision, *British Airways Bd. v. Port Auth.,* 564 F.2d 1002 (2d Cir.1977) ["*British Airways Bd. II*"], the court reiterated its conclusion that airport proprietors have an "extremely limited role" in the system of aviation regulation. 564 F.2d at 1010.

Western seizes upon the above-quoted language and argues that noise regulation is the only recognized exception to the otherwise total federal preemption of aviation. Although the cited language is quite narrow, *British Airways Bd.* and *British Airways Bd. II* were principally concerned with Section 611, the noise statute, and whether Congress, in enacting that section, intended that airport proprietors be permitted to regulate noise. The cases do not reject the existence of other proprietary

interests, but merely seek to insure that when such an interest exists, such as the control of noise, the proprietor not regulate beyond the scope of that interest.[11]

Section 1305(b)(1) does not expressly limit proprietary powers to the regulation of noise, although presumably Congress would have so limited the section if that is what it had in mind. As Judge Weinfeld said in *Midway Airlines v. County of Westchester,* 584 F.Supp. 436 (S.D.N.Y. 1984), "[t]he legislative history is unmistakably clear that Congress did not intend that the preemptive force of 49 U.S.C. § 1305(a)(1) would interfere with 'long recognized powers of the airport operators to deal with noise and other environmental problems at the local level.'" *Id.* at 440 n. 18 (quoting 124 Cong.Rec. 37419 (1978) (remarks of Sen. Kennedy)). Judge Weinfeld interpreted *British Airways II* as holding that airport proprietors may issue reasonable rules pertaining to the permissible level of noise *or other danger* which can be caused by aircraft using the airport. *Id.* at 441. He went on to uphold an airport proprietor's temporary refusal to grant airport access for a reasonable period necessary to "develop rational and nondiscriminatory rules for allocating scarce space and landing and takeoff slots." *Id.* at 440.

In another airport capacity case, *Aircraft Owners & Pilots Ass'n v. Port Authority,* 305 F.Supp. 93 (E.D.N.Y.1969), Judge Dooling upheld the Port Authority's imposition of a "takeoff" fee on certain small aircraft for the purpose of reducing airport congestion. The court specifically noted that the fee was imposed to divert air traffic during the busiest periods of the day but recognized this as a legitimate basis for regulation.

As these cases make plain, although questions of permissible noise regulation predominate in the courts, other proprietor-imposed regulations are "presently accepted as valid exercises of proprietary powers." A proprietor's interest in regulating

ground congestion at its airports would appear to be at the core of the proprietor's function as airport manager, perhaps even more so than the regulation of noise; and the ability of a proprietor such as the Port Authority to allocate air traffic in its three airport system is important to the advancement of this interest.

In *City of Houston v. FAA,* 679 F.2d 1184 (5th Cir.1982), the court considered a 1000–mile perimeter rule imposed by the FAA at Washington National Airport ["National"]. The FAA owns both National and Dulles International Airport. For reasons markedly similar to those of the Port Authority, the FAA imposed its perimeter restriction.

The Fifth Circuit upheld the rule. It first noted that section 1305(a)(1), which preempts state regulation, does not restrict the powers of the FAA, an arm of the federal government. The court then proceeded to decide the case on alternative grounds. Although holding that the FAA had power to impose a perimeter based on its authority under the Federal Aviation Act alone, it also held, as an independent ground, that the FAA's proprietary interest was sufficient to justify the rule. The court implied that the result might have been different had the proprietor not been the FAA, and cited to the Second Circuit's language in *British Airways Bd. II* that airport proprietors have an "extremely limited role" in aviation management. Nonetheless, the court carefully distinguished *Pacific Southwest Airlines v. County of Orange,* No. CV 81–3248 (C.D.Cal. Nov. 30, 1981), a case which held that a local airport proprietor could not impose a 500–mile perimeter rule, saying: "A local airport with no connection to nearby Los Angeles International or Ontario Airports, [the proprietor] could not blithely take such an action upon itself." *Id.* at 1194.

Here, as in *City of Houston,* there is in issue a multi-airport system. The effect of the perimeter rule in each case is to divert

---

**11.** Even in this respect the Second Circuit has recently upheld a regulation which limited the cumulative level of noise exposure at an airport rather than the decibel levels of individual take-offs and landings. *See Global Int'l Airways Corp. v. Port Authority,* 727 F.2d 246 (2d Cir. 1984).

air traffic from one airport to another within the respective systems, and not to close down metropolitan area runways to all air traffic to or from points outside the perimeter. This Court sees no real distinction between the FAA's interest, as proprietor of an airport system, to manage its congestion problems by use of a perimeter rule, and the interest of the Port Authority, as proprietor of LaGuardia, Kennedy, and Newark, to do the same.

Of course, the FAA, acting as airport proprietor, is likely to promulgate rules that are compatible with the overall scheme of federal regulation. This factor undoubtedly played a role in the *City of Houston* decision. However, no aspect of federal aviation is more heavily regulated than the field of noise and yet in this area local limitations are permitted. The Second Circuit in *British Airways Bd.* evaluated the reasons for permitting a proprietor to regulate noise. It first noted that airport proprietors are liable for compensable takings resulting from unreasonable airport use and therefore should have the ability to protect themselves. 558 F.2d at 83. The court went on to say "[i]t is perhaps more important ... that the inherently local aspect of noise control can be most effectively left to the operator, as the unitary local authority who controls airport access." *Id.* This reasoning applies with equal force to the control of ground congestion. The court in *City of Houston* recognized a legitimate proprietary function. This Court concludes that, in the absence of conflict with FAA regulations,[12] a perimeter rule, as imposed by the Port Authority to manage congestion in a multi-airport system, serves an equally legitimate local need and fits comfortably within that limited role, which Congress has reserved to the local proprietor.

This does not end the inquiry, however, for as the Second Circuit has instructed in *British Airways Bd.*, 558 F.2d at 84–85, and again in *British Airways Bd. II*, the airport operator is circumscribed to the issuance of reasonable, nonarbitrary and nondiscriminatory rules that advance the local interest. The Court must "carefully scrutinize all exercises of local power under this rubric to insure that impermissible parochial considerations do not unconstitutionally burden interstate commerce or inhibit the accomplishment of legitimate national goals." *British Airways Bd. II*, 564 F.2d at 1011.

█ The Court first dispenses with Western's claim that the perimeter rule unreasonably discriminates against Western. Western contends that permitting flights to Denver, while not allowing nonstop flights to places such as Salt Lake City, discriminates against all air carriers with hubs beyond the 1500–mile point. Western points out that its major competitors, which operate from LaGuardia, use a Denver hub and thus Western is unable to compete effectively with these airlines. Western does not argue that the Denver exception was created with the purpose of favoring certain airlines, and has offered no evidence which would tend to show that the "grandfathering" of Denver was in any other way improper. From Western's point of view, therefore, it would have been no different had the perimeter rule been set at 1700–miles, thereby encompassing Denver.

As the court in *City of Houston* said in a somewhat different context but in terms no less applicable here:

The accident of geography, not any deliberate discrimination against the western states, underlies the FAA's rule. The perimeter does not discriminate against a named state or states. It does not declare that Texans may not fly nonstop to National. Rather, it sets a limit of 1000 miles on nonstop flights. Some states, e.g. Louisiana, straddle the line. Some Louisiana airports meet the requirement, others do not. Just as the Rocky Mountain states possess beautiful scenery, Texas its reservoirs of oil and natural gas, and California its sandy

---

12. Although the FAA has imposed High Density Regulations to reduce air traffic at LaGuardia, Western points to no conflict between these regulations and the perimeter rule. *Cf. Global Int'l Airways Corp. v. Port Authority*, 727 F.2d 246 (2d Cir.1984) (noise regulation).

beaches, so the accident of geography places some states within 1000 miles of National and others beyond. The perimeter rule, ... for geographic reasons has an incidental effect on air travel from certain states.

679 F.2d at 1198.

In truth, all regulations tend to discriminate in some way, *see, e.g., Global Int'l Airways v. Port Authority*, 727 F.2d 246 (2d Cir.1984); *Aircraft Owner's & Pilots Ass'n v. Port Authority*, 305 F.Supp. 93 (E.D.N.Y.1969). The critical inquiry is whether that discrimination is unjust; or to put it another way, whether the discrimination is reasonable in light of the legitimate objectives sought to be achieved.

On the issue of reasonableness, as previously discussed, the Port Authority implemented the perimeter rule to reduce groundside congestion and maintain LaGuardia as a short and medium haul airport, and an airport catering to business customers. The Port believes that opening LaGuardia to long range aircraft, and with it the leisure traveler, would reduce runway capacity, increase delays, result in increasing congestion at the gates, place a heavier demand on ticketing, baggage claim facilities and public areas, increase use of parking lot facilities and cause roadway and terminal frontage access to become more congested. In the Port's view, the short haul or business traveler moves more quickly through the airport with less luggage and fewer "meeters and greeters". It is for similar reasons that the FAA imposed a perimeter at National Airport. *See City of Houston*, 679 F.2d 1184.

A brief survey of the evidence shows that the Port's conclusions are not unfounded. In 1984 the Port Authority staff commenced an evaluation of the perimeter rule. Included in this evaluation was a study of LaGuardia's capacity. The study concluded that at "current traffic levels LaGuardia Airport is operating near or above its capacity in major components of the airport system including CTB apron area and certain passenger processing areas, departure roadway and access roadways, during peak periods. The delays and congestion which are currently being experienced during these periods are symptomatic of this condition." Defendant Ex. D, Attachment III at 11. Similarly, a study performed on the LaGuardia airside capacity concluded that "[d]espite the constant near-capacity utilization, LaGuardia does experience hours when traffic exceeds the airport capacity by as much as 23 percent." Defendant Ex. D, Attachment II at 3. Another study observed that LaGuardia "is fast approaching saturation in many areas, with ground access the major constraint.... [A]dditional passenger growth can be expected." *See* Ex. D, Attachment I at 2.

At the hearing, Mr. George Howard, the Port Authority's Assistant Director for Aviation, testified that elimination of the rule would result in an increase of 1.5 million passengers, including a higher percentage of long haul passengers. The result would be more use of parking lot and baggage handling facilities as well as greater congestion at the terminal. Tr. at 91. According to the staff study, it was anticipated that some 27 daily roundtrip flights to Los Angeles, San Francisco, Seattle, San Diego, San Juan, Bermuda, Calgary, Nassau and St. Croix would likely be introduced at LaGuardia if the perimeter rule were discarded. *See* Defendant Ex. C at 10.

The Port Authority staff also circulated questionnaires to airlines, the FAA, the Department of Transportation and the State Department. The questionnaires sought comment on four possible alternatives for the perimeter rule: (1) retention of a 2000–mile policy; (2) imposition of a 1500–mile rule; (3) imposition of a 1500–mile rule with continued service to cities currently served; and (4) imposition of a 1000–mile rule. The majority of those responding favored retention of some form of perimeter restriction. *See* Plaintiff Ex. 16.

The staff ultimately recommended a 1500–mile rule. Its report notes that about 20 percent of the survey respondents favored a 1500–mile rule with most of the group favoring continuing service to cities currently served. The report concluded:

After assessing the survey results and the objections raised by respondents, staff affirms its tentative conclusion that the interests of the public and the airlines are best served by the continuation of some type of perimeter policy, particularly in view of the limited physical facilities and other inherent limitations of LaGuardia Airport and the larger capacities at Kennedy International and Newark International Airports. However, in view of the concerns expressed by the State Department and suggestions by several carriers and other parties for modification of the rule, staff recommends that the current interim rule be modified by reducing the mileage radius from 2,000 statute miles to 1,500 statute miles but allowing the continuation of service to Denver, expand the current policy to permit non-stop flights to such Canadian cities as Winnipeg which already have preclearance facilities as well as to other Canadian cities within 1,500 statute miles of LaGuardia which may acquire preclearance facilities in the future. This would exclude Calgary which is beyond 1,500 statute miles and where although service was recently instituted the stipulation entered into by the parties gives Air Canada no vested rights.

Defendant Ex. A at P–3.

Western contends that the rule does not achieve its purpose and that reducing the perimeter to 1500 miles was a purely arbitrary act.[13] However, the Port Authority conducted a careful study and review of its policy and concluded that a 1500–mile rule was necessary to meet increasing congestion problems. It is important to keep in mind that at the time of the study, which reflected increasing airport use, there was already in place an informal 2000–mile perimeter. Survey results indicated that the majority of those responding favored some

form of perimeter policy and 20 percent favored a 1500–mile rule. In setting in place a formal rule, therefore, and in light of the prospect of ever burgeoning traffic at LaGuardia, it was not unreasonable to impose a 1500–mile limit. This is especially true when access to the New York area remains unimpeded at the other area airports.

As Justice Holmes once remarked:

When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself, without regard to the necessity behind it, the line or point seems arbitrary. It might as well, or nearly as well, be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.

*Louisville Gas & Electric Co. v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770, 775 (1928) (Holmes, J., dissenting), *quoted in City of Houston,* 679 F.2d at 1193. Although Western contends that there were other means available to reduce the congestion problem, this Court will not second guess the actions of the Port Authority as long as they are reasonable. The Court finds them to be so in the instant case.[14]

## CONCLUSION

For the foregoing reasons, Western's claims for preliminary and permanent injunctive relief are dismissed. Fed.R.Civ.P.

---

**13.** To the extent Western argues that the Port Authority should have created an exception for Western in light of the fact that the market Western seeks to serve is compatible with the Port Authority's designs for LaGuardia, Western should seek relief pursuant to Sections 1349(a) and 2210. In this respect Western's remedy is with the FAA. *See Montauk-Caribbean Airways v. Hope,* 784 F.2d 91 (2d Cir.1986).

**14.** The Court notes Western's objections to the introduction of Defendant's Exhibits B and F. Although these exhibits were received for non-hearsay purposes, the Court did not rely on them in any event.

65(a)(2). The Clerk of the Court is directed to enter judgment for the defendant and dismiss the complaint.

SO ORDERED.