[No. D012688. Fourth Dist., Div. One. Nov. 27, 1991.]

UNITED AIR LINES, INC., et al., Plaintiffs and Respondents, v.
COUNTY OF SAN DIEGO, Defendant and Appellant.

COUNSEL

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, and Andrew J. Freeman, Deputy County Counsel, for Defendant and Appellant.

Kelvin H. Booty, Jr., County Counsel (Alameda) and James F. May, Assistant County Counsel, as Amici Curiae on behalf of Defendant and Appellant.

Paul, Hastings, Janofsky & Walker, Robert S. Span and Jeffrey G. Varga for Plaintiffs and Respondents.

Ajalat, Polley & Ayoob, Richard J. Ayoob, Terry L. Polley and Charles R. Ajalat as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

**WORK, J.**—The County of San Diego (County) appeals a summary judgment in favor of certain air passenger carriers (hereafter referred to collectively as Airlines), refunding taxes assessed on what the County determined to be their taxable possessory interests in the use of the San Diego International Airport (Airport), a facility owned and operated by the San Diego Unified Port District (Port District), a tax exempt governmental entity.[1] The County also appeals the denial of its own motion for summary judgment.

The trial court found: (1) the Airlines had no taxable possessory interest in the land since their use was not sufficiently exclusive; (2) the taxes were an indirect tax on the carriage of persons traveling in air commerce and prohibited by 49 United States Code, appendix section 1513(a); (3) the taxes unconstitutionally discriminated between taxpayers in the same class (commercial and general aviation); and, (4) the taxes violated federal statutes (49 U.S.C., appen. §§ 2210(a), 1305(b)). For the following reasons, we hold the trial court's rulings are legally erroneous.

The Airlines reassert two additional grounds rejected by the trial court to support the summary judgment. First, they challenge the definitions of "change in ownership" in Revenue and Taxation Code section 61, subdivisions (b) and (c)—the section allowing property tax reassessment when a taxable possessory interest in tax exempt real property is created or renewed,

---

[1] The airlines suing for the tax refund were United Air Lines, Northwest Airlines, Delta Air Lines, USAir, and Alaska Airlines.

regardless of the term of the interest, while only allowing reassessment upon lease of private property if the term is for 35 years or more. They contend this distinction between government and private property is an arbitrary and unreasonable interpretation of Proposition 13, or an unconstitutional discrimination against lessees of government land.[2] Second, they argue the valuation method used by the County improperly included enterprise value. We reject both additional grounds.

Based on our holdings on these legal issues, we conclude the County is entitled to summary judgment. Accordingly, the judgment in favor of the Airlines is reversed, and the trial court is directed to enter summary judgment for the County.

## FACTUAL AND PROCEDURAL BACKGROUND

After the San Diego County Assessment Appeals Board (Board) denied the Airlines' claim for a refund, they sued for refund of property taxes in the superior court. The facts relevant to the legal issues in their cross-motions for summary judgment are as follows.

The Airlines are commercial air carriers transporting air passengers for hire from and to the Airport. In the course of their air passenger transportation business, the carriers use landing areas and facilities[3] that are available for use by all aircraft, both commercial and private, limited only by Federal Aviation Administration regulations and local ordinances applicable to all planes. Private, noncommercial aircraft operators also use the landing facilities, from which they obtain a valuable, private benefit.

A Port District ordinance requires that landing fees must be paid by every operator of an aircraft landing at the Airport for commercial purposes, which means any aircraft landing for revenue producing purposes for air transportation services. Airline operators who have a landing permit or agreement, which provides for landing fees, need not pay cash to the Port District upon landing. These Airlines have such agreements permitting them to pay accrued fees at regular intervals.

Under federal law, the general aviation public, both commercial and private, is entitled to land at the Airport regardless whether they pay the landing fees, and the Airport may not condition the use of its landing areas

---

[2] This latter discrimination argument is made by the law firm of Ajalat, Polley & Ayoob, amicus curiae in support of the Airlines.

[3] The landing areas and facilities refer to runways, taxiways, apron areas and waste disposal and washrack facilities, roadways, and landing aids.

and related facilities on the payment of landing fees. Nevertheless, federal law authorizes the Port District to impose landing fees. (49 U.S.C., appen. § 1513(b).)

In 1986, the Port District issued landing permits to the Airlines, which constituted agreements providing for landing fees. Regardless whether such agreements were in force, the Port District was required by federal law to allow the Airlines to use the landing facilities. The Airlines' operations at and use of the landing facilities were the same before and after the 1986 agreements. The 1986 agreements noted that the landing permits "may result in a taxable possessory interest and be subject to the payment of property taxes."

All private, noncommercial aircraft operators at the Airport paid flowage fees to the Port District, which are surcharges on fuel and oil dispensed at the Airport and which cover the costs associated with operating the landing facilities.

In 1986, in response to suggestions in a letter from the Assessments Standards Division of the State Board of Equalization, the County began for the first time to make possessory interest tax assessments against each Airline based on their use of the landing facilities. The alleged possessory interest was valued by capitalizing the income generated by the Port District from the Airlines' use of these facilities.[4]

The County did not make possessory interest assessments against private, noncommercial aircraft users of the landing facilities, but did assess and tax these possessory interests of cargo airlines who used the landing areas in the course of their business of picking up and delivering commercial cargo.

EXCLUSIVITY OF THE AIRLINES' POSSESSORY INTEREST

■ Possessory interests in land are taxable pursuant to the constitutional mandate that with limited exceptions, all property is taxable. (*Scott-Free River Expeditions, Inc.* v. *County of El Dorado* (1988) 203 Cal.App.3d 896, 901-902 [250 Cal.Rptr. 504]; Cal. Const., art. XIII, § 1.) The right to possess and use land or improvements "except when coupled with ownership of the land or improvements in the same person" is treated as a possessory interest and is subject to taxation. (*United States of America* v. *County of Fresno* (1975) 50 Cal.App.3d 633, 638 [123 Cal.Rptr. 548], and cases cited therein.) "Generally speaking, a possessory interest includes the right of a private individual or corporation to use government-owned tax exempt land or

---

[4]The method by which the County calculated value is not an issue in this appeal.

improvements, and this right is considered a private interest taxable by the state and its taxing agencies." (*Ibid.*; Rev. & Tax. Code, § 107, subd. (a).) The purpose of Revenue and Taxation Code section 107 is to protect the public domain from private profit without tax liability. (*Stadium Concessions, Inc.* v. *City of Los Angeles* (1976) 60 Cal.App.3d 215, 225 [131 Cal.Rptr. 442].)

For a possessory tax to be valid, the right of possession must carry with it "the degree of *exclusiveness* necessary to give the occupier or user something more than a right in common with others . . . ." (*United States of America* v. *County of Fresno, supra,* 50 Cal.App.3d at p. 638; *Scott-Free River Expeditions, Inc.* v. *County of El Dorado, supra,* 203 Cal.App.3d at p. 908.)[5] Although one court has stated the exclusivity requirement means that the use "must not be one shared by the *general public*" (*Freeman* v. *County of Fresno* (1981) 126 Cal.App.3d 459, 463-464 [178 Cal.Rptr. 764], italics added), the shared use of property with others does not defeat the exclusivity requirement, but merely affects valuation of the taxable interest (*Scott-Free River Expeditions, Inc.* v. *County of El Dorado, supra,* 203 Cal.App.3d at pp. 908-910).

As defined in California Code of Regulations, title 18, section 21, a possessory interest is an "interest in real property which exists as a result of possession, exclusive use, or a right to possession or exclusive use of land . . . unaccompanied by the ownership of a fee simple or life estate in the property." ▪ Thus, either a right to possession *or* a right to exclusively use the Airport landing areas will give rise to a taxable possessory interest. California Code of Regulations, title 18, section 21 goes on to state that "exclusive use" is not destroyed by "[c]oncurrent use when the extent of each party's use is limited by the other party's right to use the property at the same time, as, for example, when two or more parties each have the independent right to graze cattle on the same land." (See also *Board of Supervisors* v. *Archer* (1971) 18 Cal.App.3d 717, 727 [96 Cal.Rptr. 379] [the court found that concurrent use of the same public grazing lands to generate private profits by multiple permit holders did not destroy the requisite exclusivity which allowed a county to impose property taxes on the possessory interest created].)

Clearly, under the state tax regulations, there can be multiple exclusive concurrent yet independent users of the same property. We see no functional

---

[5] In addition to exclusiveness, the elements to be tested to determine the existence of a possessory interest, are durability, independence, and private benefit. (*Cox Cable San Diego, Inc.* v. *County of San Diego* (1986) 185 Cal.App.3d 368, 377 [229 Cal.Rptr. 839].) The Airlines challenge only the exclusivity requirement.

difference between cattle grazing on the same acreage and aircraft making daily landings on the same airstrip and using the same support facilities. In some respects, successive cattle grazing the same land are unable to maximize their right because once a mouthful of grass has been swallowed it is not available for the next cow. However, once an aircraft has landed and moved to a secondary area, the landing strip is available to the next aircraft landing to the same extent it was before being used by its predecessor.

As stated in *Freeman v. County of Fresno, supra*, 126 Cal.App.3d at page 463, as quoted in *Scott-Free River Expeditions, Inc. v. County of El Dorado, supra*, 203 Cal.App.3d at page 912:

" 'In more recent times the three . . . requirements [exclusivity, durability and independence] have been applied in a less demanding way so as to find a taxable interest in most cases in which the private use of public property has been special to the person concerned and valuable. . . . [T]he focus has been on the belief that the holder of a valuable use of public property that is tax exempt should contribute taxes to the public entity which makes its possession possible and provides a certain amount of exclusivity.' "

In *Scott-Free*, the court found a taxable possessory interest in the use of the river for commercial rafting purposes where there was a limit of 80 commercial rafting operators permitted to concurrently carry passengers for hire on a public waterway within the taxing county. The use of the river by other rafters, regardless whether carrying passengers, was unrestricted. As is the case here, all rafters had a legally unlimited right to engage in the identical concurrent use of the water. However, a taxable interest was identified only to those 80 whose usage was essential to their "on-site" business. Here, as in *Scott-Free River Expeditions, Inc. v. County of El Dorado, supra*, 203 Cal.App.3d at pages 909-910, it is the Airlines' ability to use the common landing area to accommodate their "on-site" private air transportation businesses carried on at the Airport that segregates them from the general aviation public whose landing rights are concurrent. Certainly, if the Airlines had to lease private landing sites for the purpose of picking up and discharging the passengers they charge to fly to and from San Diego, they would be assessed rental fees which would incorporate the costs incurred by the private owner to maintain and operate that facility and also an increment equivalent to the proportion of property taxes which reflects the intensity of their use. That this facility is owned by a tax exempt entity is a fortuity which is unrelated to whether these Airlines should escape similar taxes. Thus, it seems appropriate the aircraft should contribute their *"proper share, according to the value of the interest, whatever it may be, of the taxes necessary to sustain the Government which recognizes and protects [them]." (Kaiser Co. v. Reid* (1947) 30 Cal.2d 610, 618 [184 P.2d 879], original italics.)

Here, the airport landing facilities are on government property and are made available for the Airlines' use in performing an essential part of their on-site private business operations. There is some degree of exclusivity arising from the fact that this landing facility is devoted solely to the use by aircraft and cannot be devoted to any other public use. However, these Airlines fall within an even narrower class of aircraft operators, those whose business includes using these facilities to permit it to pickup and discharge passengers at this Airport according to a regular schedule.[6]

The fact that airlines who do not operate regularly scheduled air transportation services at the Airport and private aircraft also use the land without paying property taxes does not alter the fact the Airlines' use is an adjunct of the enterprises this limited group of air carriers operate for profit at the Airport. That other users are not taxed is relevant only to the Airlines' equal protection argument (discussed *infra*).

## ANTI-HEAD TAX ACT

The Airlines claim the method of determining the tax creates an indirect tax on the carriage of persons traveling in air commerce, in violation of the Anti-Head Tax Act. Appendix section 1513(a) of 49 United States Code (hereafter subdivision (a)), provides:

"No State (or political subdivision thereof, . . . ) shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom; . . ."

However, 49 United States Code, appendix section 1513(b) (hereafter subdivision (b)) provides:

"[N]othing in this section shall prohibit a State . . . from the levy or collection of taxes other than those enumerated in subsection (a) of this section, including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and nothing in this section shall prohibit a State . . . owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities."

In determining whether a local assessment is preempted by 49 United States Code, appendix section 1513, it is necessary to look to the character of the levy, not its label. In *Aloha Airlines, Inc.* v. *Director of*

---

[6]For the 1986-87 tax period, these schedules resulted in a high of 7,800 landings for PSA and 4,800 for United to a low of 1,200 for Alaska and 600 for USAir. One would assume there are a commensurate number of airstrip uses in takeoffs.

Taxation (1983) 464 U.S. 7, 11-13 [78 L.Ed.2d 10, 14-16, 104 S.Ct. 291], the court held the state's 4 percent tax on airlines' "gross income" was a preempted gross receipts tax. Further, even though the tax measured by solely gross receipts was labeled as a personal property tax, it was not exempt under subdivision (b), since "a property tax that is measured by gross receipts constitutes at least an 'indirect' tax on the gross receipts of airlines." (*Aloha Airlines, Inc.* v. *Director of Taxation, supra,* 464 U.S. at pp. 13-14 [78 L.Ed.2d at p. 16].) *Aloha Airlines, Inc.* notes:

"Section 1513(a) pre-empts a limited number of state taxes, including gross receipts taxes imposed on the sale of air transportation or the carriage of persons traveling in air commerce. Section 1513(b) clarifies Congress' view that the States are still free to impose on airlines and air carriers 'taxes other than those enumerated in subsection (a),' such as property taxes, net income taxes, and franchise taxes. While neither the statute nor its legislative history explains exactly why Congress chose to distinguish between gross receipts taxes imposed on airlines and the taxes reserved in § 1513(b), the statute is quite clear that Congress chose to make the distinction, and the courts are obliged to honor this congressional choice." (*Id.* at p. 12, fn. 6 [78 L.Ed.2d at p. 15].)[7]

Thus, regardless of its labeling, a local entity may not collect taxes prohibited by subdivision (a)—i.e., based on gross receipts, the carriage of passengers, or on the sale of air transportation. However, it is not restricted from imposing a property tax where the rate is based on other criteria.

 The property tax here is calculated using a formula based on the actual annual landing fees each airline paid.[8] The amount of each landing fee is determined by the maximum approved weight of the landed aircraft.[9] Since the fee is based upon the FAA approved maximum landing weight of the aircraft rather than its actual weight, it is not premised on the actual

[7]*Aloha Airlines, Inc.* v. *Director of Taxation, supra,* 464 U.S. at pages 8-9, 12 [78 L.Ed.2d at pages 12-13, 15], also notes that subdivision (a) was enacted primarily to preempt local head taxes on airline passengers, since air travelers were already taxed under federal aviation taxes. For unspecified reasons, Congress also chose to preempt local gross receipts taxes. (464 U.S. at p. 13 [78 L.Ed.2d at p. 15].)

[8]More specifically, the "income method" used to value the possessory interest included calculations based on the actual "rental" income received by the Port District in the form of landing fees paid during preceding years, from which the County determined a stabilized landing fee each airline was forecast to pay for the five-year term of the possessory interest. The County then used a formula which included deductions for operating expenses, calculation of a capitalized amount representing the value of the fee simple, allocation of the value between land and improvements, etc.

[9]The stipulation states the landing fees were set at "79.5 cents per thousand pounds of Federal Aviation Administration ('FAA') approved maximum landing weight of the aircraft per landing, or $15.00 per landing, whichever is greater."

number of passengers on board, and an empty plane is charged the same fee as a plane of equal maximum weight filled with passengers. Thus, the number of passengers is not the direct measure of the tax. However, the Airlines argue the formula indirectly taxes the carriage of persons, because in fact the more persons an airline carried to the Airport, the more landing fees it paid and the greater the property tax generated. This is the logical result of commercial air passenger service in which the number of aircraft landings is going to increase or decrease with the number of passengers embarking or debarking. That this correlation itself is not determinative is reflected in other exceptions set forth in subdivision (b). For example, there could be some correlation between net income and the number of passengers carried, and yet subdivision (b) allows a net income tax. Moreover, subdivision (b) allows landing fees which bear the same correlation. The Airlines do not claim the landing fees here violate the statute (see *New England Legal Foundation* v. *Mass. Port Auth.* (1st Cir. 1989) 883 F.2d 157, 170); and these landing fees are the measurement used to calculate the property tax.[10]

Finally, the Airlines argue these property taxes may not be assessed because they are treated as general County revenue rather than segregated for use solely to develop existing Airport facilities. They cite *City & County of Denver* v. *Continental Air Lines, supra,* 712 F.Supp. at page 840,[11] which held that a 96 percent increase in landing fees to generate revenue to finance the debt service for bonds Denver contemplated issuing to build a new airport violated the restriction of subdivision (b). That subdivision restricts landing fee revenue to the operation and maintenance of presently existing airport facilities. Although *City & County of Denver,* in dicta, mentioned

[10] It has been recognized that all fees and taxes imposed on airlines can be viewed as in essence constituting indirect charges on the carrying of persons in air commerce. (*City & County of Denver* v. *Continental Air Lines* (D.Colo. 1989) 712 F.Supp. 834, 839.) Nevertheless, if the tax falls within the exemption in subdivision (b) and is not measured by the criteria prohibited in subdivision (a), the statute is not violated.

[11] The parties' stipulation states: "The taxes collected as a result of the assessments at issue . . . were used by the County in the same manner as all property taxes collected by the County. The taxes at issue were not specifically earmarked for Airport use, although they were used for such purposes as to provide law enforcement and fire protection at the Airport and to pay for public roads leading to the Airport. The taxes at issue were not used to operate and maintain existing or then-existing Airport facilities. The taxes at issue were not used for the operation, repair and maintenance of the landing areas and related facilities at the Airport. The taxes at issue were not expended for the capital or operating costs of the Airport, the Airport system, or other local facilities which are owned or operated by the [Port] District and which directly and substantially relate to the actual air transportation of passengers or property."

taxes as well as landing fees, no such restriction is imposed in the statute.[12] Subdivision (b) states:

"Nothing in this section shall prohibit a State . . . from the levy or collection of taxes other than those enumerated in subsection (a) of this section, including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and nothing in this section shall prohibit a State . . . owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators *for the use of airport facilities.*" (Italics added.) While the section specifically restricts the use of landing fees, it does not limit the use of property taxes.

## EQUAL PROTECTION

The Airlines argue the tax denies them equal protection because it is not imposed against all members of the general aviation class. The Airlines have stipulated the untaxed aircraft are those who do not use the landing strip for revenue producing purposes for air transportation services.

The states have great leeway in classifying and drawing lines which in their judgment produce reasonable systems of taxation. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 232-234 [149 Cal.Rptr. 239, 583 P.2d 1281].) A challenge to a classification in state tax law will not prevail even if it discriminates in favor of a certain class, as long as the discrimination is founded upon a reasonable distinction or difference in state policy not in conflict with the federal Constitution. (*Id.* at p. 234.) So long as the taxation system is supported by a rational basis, and is not palpably arbitrary, it will be upheld. (*Ibid.*)

The distinction between commercial and noncommercial aircraft creates a reasonable classification which defeats the Airlines' constitutional challenge.

---

[12] *City & County of Denver* v. *Continental Air Lines, supra,* 712 F.Supp. at pages 839-840, states:

"Section 1513(b) expressly provides that certain types of 'reasonable rental charges, landing fees, and other service charges' can be collected; however these charges and fees are to be collected from a particular group, 'aircraft operators' and only 'for the use of airport facilities.' The plain language of the statute clearly prohibits the assessment of the costs of planning, acquiring or developing a new airport facility through the rates, fees and charges to the airlines now using Stapleton. . . .

"This court is convinced after examining the legislative history and purpose of the Anti-Head Tax Act that in order to avoid the double taxation of air passengers in air commerce through local and federal use taxes, Congress prohibited the imposition of such local taxes, fees, and charges that would be passed on to the flying public *except* where those taxes, fees, and charges are to be used to operate and maintain the presently existing airport facilities."

Taxation of commercial aircraft supports a rational state policy of charging those who use government land for revenue producing purposes. By rationally placing commercial and noncommercial aircraft in different classes, the tax does not discriminate against persons of the same class. (See *Evansville Airport* v. *Delta Airlines* (1972) 405 U.S. 707, 718-719, fn. 13 [31 L.Ed.2d 620, 630-631, 92 S.Ct. 1349] [fees levied on commercial aviation, but not on smaller private planes, was based on rational distinction; commercial aviation necessitated more elaborate facilities].)[13]

## FEDERAL STATUTES

 Premised on the distinction made by the County between commercial and noncommercial aviation, the Airlines argue the tax is discriminatory and thus preempted by certain federal statutes. Appendix section 1305(a) and (b) of 49 United States Code (Federal Aviation Act, § 105) provide for federal preemption of laws relating to air carrier "rates, routes or services," except that a state may exercise proprietary powers and rights as owner or operator of an airport. The rules issued under a state's proprietary powers must be reasonable, nonarbitrary and nondiscriminatory. (*Western Air Lines* v. *Port Auth. of N.Y. & N.J.* (S.D.N.Y. 1986) 658 F.Supp. 952, 957-958.) Although it has been held an airline may bring a supremacy clause challenge under 49 United States Code section 1305 to an allegedly discriminatory local rule pertaining to "rates, routes, or services" (*Western Air Lines* v. *Port Auth. of N.Y. & N.J., supra,* 658 F.Supp. at p. 955, affd. *Western Air Lines* v. *Port Auth. of N.Y. & N.J.* (2d Cir. 1987) 817 F.2d 222, 225-226), it has been questioned whether a party may bring a private suit based on the section (see *New England Legal Foundation* v. *Mass. Port Auth., supra,* 883 F.2d at p. 171, fn. 25).

In any event, assuming arguendo an action may be brought under 49 United States Code section 1305 and a property tax may relate to "rates, routes or services," our holding that the distinction between commercial and noncommercial aviation is reasonable and fair dispenses with this argument.

 As reflected in the trial court's order, the Airlines also relied on 49 United States Code, appendix section 2210(a)(1) and (a)(12) (Airport and Airway Improvement Act, § 511), which provide that as a condition

---

[13]*Evansville Airport* also held a state could assess a head tax on air passengers, which holding was superseded by the enactment of the Anti-Head Tax Act. (See discussion in *New England Legal Foundation* v. *Mass. Port Auth., supra,* 883 F.2d at p. 174.)

precedent to approval of federal funds for airport development,[14] written assurances must be given to the Secretary of Transportation that the airport will be available for public use on fair and reasonable terms and without unjust discrimination, and that revenues generated by the airport and local taxes on aviation fuel will be expended for the capital and operating costs of the airport. The courts have held that this statute is only enforceable by the Secretary of Transportation, and creates no private or supremacy clause cause of action. (*New England Legal Foundation* v. *Mass. Port Auth., supra,* 883 F.2d at pp. 168-169; *Western Air Lines* v. *Port Auth. of N.Y. & N.J., supra,* 817 F.2d at p. 225.) We need not address this argument further.

## CHANGE IN OWNERSHIP

The County contends its 1986 property tax assessments were authorized, because there was a change in ownership by virtue of the "renewal and/or extension of the alleged taxable possessory interest in the landing areas and related facilities at the Airport."

Article XIII A, section 2, subdivision (a) of the California Constitution (added by Prop. 13 in June 1978) permits reassessment of property taxes when a "change in ownership has occurred." (See *Wrather Port Properties, Ltd.* v. *County of Los Angeles* (1989) 209 Cal.App.3d 517, 521 [257 Cal.Rptr. 266].) Revenue and Taxation Code section 61, subdivision (b) includes within the definition of change in ownership "[t]he creation, renewal, sublease, or assignment of a taxable possessory interest in tax exempt real property for any term." Revenue and Taxation Code section 61, subdivision (c)(1) includes within the definition of change in ownership "[t]he creation of a leasehold interest in taxable real property for a term of 35 years or more (including renewal options) . . . ."

The Airlines object to the Revenue and Taxation Code distinction between tax exempt government property, where a change in ownership allowing reassessment occurs regardless of the term of the taxable possessory interest, and taxable private property, where a change in ownership occurs only if the term of the lease is for 35 years or more.[15] The Airlines argue this statutory distinction violates the intent of Proposition 13

---

[14] The parties stipulate the Port District, which operates the Airport, has obtained federal funds for airport development.

[15] The County argues the Airlines have waived this issue since the trial court rejected this argument and granted the summary judgment in the Airlines' favor on other grounds, and the Airlines did not file an appeal from the judgment. We address the issue since it is our role to review the validity of the ruling, not the reasons therefor (*Barnett* v. *Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 682 [187 Cal.Rptr. 219]), and we affirm the summary judgment if it is proper on any of the grounds raised below. This is not an issue involving facts or claims not

since it discriminates against lessors and lessees of government property, as compared to lessors and lessees of private property. The Airlines point out that since the term of their alleged taxable possessory interest was determined by the County to be five years, it could not have asserted a change of ownership to make the tax assessment if the interest had been in private property.[16]

Article XIII A, section 2, subdivision (a) of the California Constitution does not define "change in ownership." Accordingly, the Legislature enacted Revenue and Taxation Code provisions to define the phrase, including sections 61 and 62. (See *Twentieth Century Fox Film Corp.* v. *County of Los Angeles* (1990) 223 Cal.App.3d 1158, 1161 [273 Cal.Rptr. 76].) When a constitutional provision has a doubtful or obscure meaning, there is a strong presumption in favor of the Legislature's interpretation. (*Kraft, Inc.* v. *County of Orange* (1990) 219 Cal.App.3d 1104, 1109 [268 Cal.Rptr. 643].) We uphold the Legislature's interpretation if it is not unreasonable or arbitrary. (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 693-694 [97 Cal.Rptr. 1, 488 P2d 161].)

Revenue and Taxation Code section 60 states that a change of ownership means "a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." In short, in order for there to be a change in ownership, a party must obtain the equivalent of a fee interest. The Legislature therefore had to determine the type of interests in real property which carry sufficient indicia of a fee interest to be deemed a change in ownership for tax reassessment purposes. Initially, we note the Legislature could reasonably determine that an owner who leases his private real property has not transferred ownership for tax purposes, unless the lease is for a substantial length of time—i.e., 35 years. (See *Howard* v. *County of Amador* (1990) 220 Cal.App.3d 962, 973-974 [269 Cal.Rptr. 807].)

In contrast, when evaluating the "fee interest" indicia in government property, the Legislature is dealing with an inherently different type of

---

raised below (see, e.g., *Webster* v. *Southern Cal. First Nat. Bank* (1977) 68 Cal.App.3d 407, 416 [137 Cal.Rptr. 293]), nor a case where a nonappealing respondent seeks reversal of the judgment (see, e.g., *California State Employees' Assn.* v. *State Personnel Bd.* (1986) 178 Cal.App.3d 372, 382, fn. 7 [223 Cal.Rptr. 826]).

[16]Amici curiae in support of the Airlines point out that if Revenue and Taxation Code section 61, subdivision (b) is struck down, this does not mean the Airlines could not be taxed at all on the landing areas, but rather they could be taxed in the same manner as private property lessees. The underpinning of the argument by the Airlines and their amicus curiae (discussed *infra*) is that Revenue and Taxation Code section 61 results in more frequent tax *reassessment* of government property leases as compared to private property leases.

interest, by virtue of the fact the government is not taxed on its land. To support the reasonableness of the determination that the creation or renewal of a taxable possessory interest constitutes a change in ownership regardless of the term of the interest, the County points to a report in the legislative history which so states, premised on a characterization of taxable possessory interests in government property as having only one "owner" of taxable real property (the lessee), since the lessor (the government) is tax exempt.[17] Thus, when the government gives a taxable possessory interest in land, it can reasonably be viewed as always transferring the equivalent of a fee interest even if the interest is for a short-term, since before the transfer there was no taxable possessory interest at all. In contrast, before the creation of the leasehold, the private property owner had a taxable interest in the land, and the Legislature could reasonably determine he did not transfer that interest to another owner unless he created a long-term lease.

Given this fundamental difference between private taxable and government tax exempt land, the distinction made by the Legislature is not unreasonable and arbitrary.

The Airlines argue the distinction is opposed to the actual intent of Proposition 13, which was tax limitation. The argument fails since Proposition 13 also evinced an intent to allow reassessment when there is a change in ownership, and as we have stated, the Legislature could reasonably deem every creation and renewal of a taxable possessory interest in government land to constitute a change in ownership.

Amicus curiae in support of the Airlines argues that Revenue and Taxation Code section 61, subdivision (b) unconstitutionally places a heavier tax burden on lessees of government land, as compared to lessees of private land. Amicus curiae analogizes to federal supremacy clause cases which require that in order not to violate the federal government's constitutional immunity from state taxation, a heavier tax burden cannot be placed on those contracting with the federal government, as compared to others. (See *Washington v. United States* (1983) 460 U.S. 536, 540-542, 545 [75 L.Ed.2d 264, 269-273, 103 S.Ct. 1344].) It argues that by allowing a change of ownership reassessment every time a lease of government property is created or renewed, there is a periodic increase of the taxes owed on short-term taxable

---

[17] The report states: "The creation, assignment or sublease of possessory interests in tax exempt property are changes in ownership *regardless of their term* (Section 61(b)). That is not inconsistent with private leases, however. In possessory interest there is only ONE owner of taxable real property, the lessee, because the lessor's interest is tax exempt. The lessee's interest, therefore, is always 'substantially equivalent' to the fee interest in the *taxable* real property." (1 Assem. Rev. & Tax. Com. Rep. on Property Tax Assessment (Oct. 29, 1979) pp. 26-27.)

possessory interests, causing lessees of government property to bear an increasing share of taxes when compared with private property for which lessees trigger reassessment only if leases are for 35 years or more.[18]

In reviewing a constitutional challenge to the face of a statute, rather than a challenge to the statute as applied, we evaluate whether the terms of the statute "inevitably pose a present total and fatal conflict" with constitutional provisions. (*Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 181 [172 Cal.Rptr. 487, 624 P.2d 1215]; see also *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 679 [209 Cal.Rptr. 682, 693 P.2d 261].)

Assuming arguendo that a no-extra-burden standard should be applied equally to a party contracting with the local government as the United States Supreme Court has applied to a party contracting with the federal government, we reject this facial challenge. As we explain, given the fundamental difference between tax exempt government property and taxable private property, there is no showing that lessees of government property will necessarily bear a greater tax burden than lessees of private property. As pointed out by the County, amicus curiae's argument ignores several components of the tax picture which defeat its claim a disproportionate tax burden is necessarily imposed on lessees of government property so as to establish facial unconstitutionality.

Unlike a tax exempt government landowner, a private landowner is taxed on the full value of his fee interest, which cost he may of course pass on to even a short-term lessee. (See *Washington* v. *United States, supra,* 460 U.S. at pp. 543-544 [75 L.Ed.2d at pp. 271-272].) Even though reassessment is triggered every time a lease of government property is created or renewed, whereas no such reassessment occurs upon creation or renewal of a short-term private lease, on the other hand reassessment is triggered when the underlying private fee is sold. Thus, private property that is regularly sold could carry a tax burden comparable to, or greater than, government land which is regularly leased. Further, the lessee of government land is only taxed on the value of the use for the unexpired term of the lease, not on the full fee value of the land. (*Texas Co.* v. *County of Los Angeles* (1959) 52

---

[18]Amicus curiae points out that former Revenue and Taxation Code section 110.6 (the predecessor to § 61) treated tax exempt and taxable real property the same, defining change of ownership as occurring upon the creation of a leasehold or taxable possessory interest, or the sublease or assignment ^hereof, for a term in excess of 10 years. (Stats. 1978, ch. 332, § 26, p. 701.) Former Revenue and Taxation Code section 110.6 was hastily enacted in 1978 after the approval of Proposition 13, and was repealed by its own terms on July 1, 1979. Revenue and Taxation Code section 61 was the product of recommendations of a task force appointed to develop more comprehensive definitions. (See *Allen* v. *Sutter County Bd. of Equalization* (1983) 139 Cal.App.3d 887, 891 [189 Cal.Rptr. 101].)

Cal.2d 55, 63 [338 P.2d 440].) Thus, even though the value of the possessory interest is reassessed every time a lease is created or renewed, the lessee's tax burden does not necessarily exceed the tax burden which can be passed on to the short-term lessee of private property, the latter property which is always taxed at its full value and, unlike the government land, has no tax exempt reversionary interest. (*Ibid.*)

In short, since the tax exempt status of government land gives rise to no taxes to pass on to lessees of government land, taxing those lessees every time they lease government land to the extent of their possessory interest, does not inevitably impose an excess tax burden on them as compared to short-term lessees of private property, the latter who may be subjected to the full tax burden of the private property owner and to the reassessment which occurs every time the property is sold.

ENTERPRISE VALUE

The Airlines argue the County's valuation method improperly includes enterprise value, an argument rejected by the trial court.

We address the issue to the extent it presents a question of law challenging the County's method of taxation[19] (see *Bret Harte Inn., Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354]; *County of Stanislaus* v. *Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1455 [262 Cal.Rptr. 439]), and conclude the County's method does not necessarily include enterprise value so as to render the method improper (*ITT World Communications, Inc.* v. *County of Santa Clara* (1980) 101 Cal.App.3d 246, 257 [162 Cal.Rptr. 186]).

When earnings are taken into account to value the property, income derived in large part from enterprise activity may not be ascribed to the property; instead, the value should be based on earnings from the property itself or from the beneficial use thereof. (*California Portland Cement Co.* v. *State Bd. of Equalization* (1967) 67 Cal.2d 578, 584 [63 Cal.Rptr. 5, 432 P.2d 700]; *Madonna* v. *County of San Luis Obispo* (1974) 39 Cal.App.3d 57, 60-61

---

[19]Although the parties' stipulation states that at the hearing before the Board the Airlines disputed the legality of the assessment method, apparently the Airlines did not specifically present the enterprise value issue to the Board. In its written decision, the Board noted that the "valuation of the taxable interest was not a matter either party disputed, or on which the parties presented evidence." In a superior court action for a tax refund, no recovery is allowed "upon any ground not specified in the claim" filed with the Board. (Rev. & Tax. Code, § 5142; see Rev. & Tax. Code, §§ 5141, subd. (c), 1603, 1620.) Although the County points out that at the hearing before the Board the Airlines did not dispute the computation of value, the County does not argue we should not reach the merits of the legal issue.

[113 Cal.Rptr. 916].) However, when no practicable basis appears for apportionment of income as between enterprise activity and the property itself, a method may be employed which imputes an appropriate income to the property. (*California Portland Cement Co.* v. *State Bd. of Equalization, supra,* 67 Cal.2d at p. 584.)

As discussed above, the value of the Airlines' possessory interest was determined from a calculated rental income to the Port District from revenue received from landing fees. The extent of the Port District's revenue is based on the number of landings at the Airport and the maximum approved weight of each aircraft. The Airlines argue the number of landings is directly and solely related to the enterprise skills of each airline, i.e., the better the marketing and advertising skills, and the higher the quality of passenger service, the more passengers will fly, and, in turn, the more landings an airline will make and the larger its aircraft will be. The Airlines point to the figures which show the assessed values of the individual airlines range from $231,000 to $2,380,000 and argue that since each airline has an interest in the exact same landing facilities, the difference in value is solely the result of including the value of each airline's enterprise activities.

We reject this "market share" approach. The County's assessment method is neutrally based on the number of times an aircraft uses the landing facility. This formula imputes income to each airline, based on the extent of the use of the landing facilities, regardless of the income actually derived from the manner in which the enterprise is organized, and thus regardless of the level of a particular airline's enterprise skills. There is nothing to establish that the County's method necessarily includes enterprise value.

In sum, none of the legal challenges presented by the Airlines to the property tax assessments can prevail. The County is entitled to a summary judgment denying the Airlines' claim for a tax refund.

### DISPOSITION

The judgment in favor of the Airlines is reversed. The trial court is directed to enter judgment in favor of the County.

**WIENER, Acting P. J.—** ██ ██ ██ ██ ██ ██
██ I concur in the result reached by the lead opinion and the majority of its reasoning. The only area of concern I have is the issue of exclusivity. While I would concede the trend has been to expand the concept of possessory interest almost beyond any limits (see Ehrman & Flavin, Taxing Cal. Property (3d. ed. 1989) § 3.08, ch. 3, p. 22), I agree with many of the

thoughts ably expressed in the dissent on the parameters of the exclusivity doctrine. Were we writing on a clean slate, I would be inclined to hold that a use of property is not "exclusive"—and hence not a taxable possessory interest—where the character of the use is identical to that shared with members of the general public on an unrestricted basis.

As the dissent implicitly recognizes, however (dis. opn., *post*, pp. 444-445), such an approach is difficult to square with the decision in *Scott-Free River Expeditions, Inc.* v. *County of El Dorado* (1988) 203 Cal.App.3d 896 [250 Cal.Rptr. 504]. There, the court held that the county could tax the possessory interest in a river held by 80 commercial rafting companies despite the fact that members of the general public enjoyed unrestricted use of the river for noncommercial rafting purposes. The 80 companies' use was viewed as "exclusive" even though any number of rafts of any size carrying any number of people could also use the river. Apparently as long as the commercial use of the public property is in some way restricted, the character of the use need be no different than that enjoyed by the public generally. Under this theory, putting aside interstate commerce considerations, I assume a state could issue permits to trucking companies and proceed to tax the companies for their "possessory interest" in the state's roadways.

Unlike the dissent, I do not find the *Scott-Free* rationale distinguishable. It is true that there, the number of commercial rafters who could obtain permits to use the river was directly limited by the County of El Dorado to 80 whereas here there is no comparable restriction on the number of commercial planes which can land at Lindbergh Field. Nonetheless, the commercial use of the airport is restricted. Only certain airlines have scheduled flights originating or terminating in San Diego and facilities there to load, unload and service passengers. Moreover, it is only regularly scheduled airlines which can obtain landing permits (see lead opn., *ante*, pp. 426, 429) and which are subject to the tax on their possessory interest. An unscheduled landing by a commercial airliner (e.g., an emergency landing) would not result in a possessory interest tax.

Having concluded that *Scott-Free* controls but that its reasoning can be questioned, I recognize we are not bound to follow the decision of any other intermediate appellate court with which we disagree. I believe that in these circumstances, however, the values served by the doctrine of stare decisis are paramount. We rarely visit the subject of taxation, even less frequently the arcane subject of possessory interests. Others, however, such as the County of San Diego here, have a keener interest in the topic because it directly affects their fiscal planning. Consequently, published cases on this subject—

particularly those like *Scott-Free* which authorize taxation—are understandably relied on by public agencies throughout the state. The *Scott-Free* decision is now over three years old—more than sufficient time for governmental agencies to take it into account in setting tax policy. Disagreeing with *Scott-Free* would virtually require the Supreme Court to grant review to resolve the conflict. To avoid this situation, I conclude the most appropriate course of action here is to rely on precedent to validate the County's possessory interest tax.

**FROEHLICH, J.,** Dissenting.—The taxability of possessory interests in real property, the fee of which is owned by tax-exempt entities, is well established. The evolution of the definition of a taxable "possessory interest" is set forth in a short but effective historical review in *Freeman* v. *County of Fresno* (1981) 126 Cal.App.3d 459, 462-464 [178 Cal.Rptr. 764], and described as a "protax trend." (*Id.* at p. 463.) Ehrman and Flavin, in their text Taxing California Property, sum up the trend by stating: "There are almost no limits to which the possessory interest concept can be pushed." (1 Ehrman & Flavin, Taxing Cal. Property (3d ed. 1989) § 3.08, ch. 3, at p. 22)

Originally viewed as an interest akin to a lease, as distinguished from a mere license (*Kaiser Co.* v. *Reid* (1947) 30 Cal.2d 610 [184 P.2d 879]), the definition of a "possessory interest" has been expanded to recognize a "property" interest in all manner of uses of tax-exempt property, many of which only vaguely resemble traditional common law concepts of an interest in land. (See the detailed summaries of uses set forth in *Freeman* v. *County of Fresno, supra,* 126 Cal.App.3d at p. 461, fn. 1, and *Scott-Free River Expeditions, Inc.* v. *County of El Dorado* (1988) 203 Cal.App.3d 896, 903, fn. 1 [250 Cal.Rptr. 504].)

Notwithstanding this trend, applicable law still purports to recognize standards distinguishing a "possessory interest" in land from other activities which take place thereon. In a sense, everything that is done by anyone of necessity takes place on real property (land, sea, tidelands, air space, etc.) but it is not, we presume, all subject to property tax. It was, to be sure, dictum, but the court in *Freeman* v. *County of Fresno, supra,* 126 Cal.App.3d 459 assumed that the street artist on Telegraph Avenue was not vested with a possessory interest.

We examined the definition of "possessory interest" at length in *Cox Cable San Diego, Inc.* v. *County of San Diego* (1986) 185 Cal.App.3d 368 [229 Cal.Rptr. 839]. We therein noted the definitions contained in Revenue and Taxation Code section 107, subdivision (a) ("Possession of, claim to, or right to the possession of land or improvements") and in Board of Equalization regulations ("an interest in real property which exists as a result of

possession, exclusive use, or a right to possession or exclusive use of land and/or improvements") (Cal. Code Regs., tit. 18, § 21, subds. (c), (d) and (e).) We concluded that "The elements to be tested in order to determine the existence of a possessory interest are, generally, exclusiveness, durability, independence and private benefit." (*Cox Cable, supra,* at p. 377.)

The element of durability has, I conclude, been diluted to a degree of almost nonexistence. In *United States of America* v. *County of Fresno* (1975) 50 Cal.App.3d 633 [123 Cal.Rptr. 548], the occupancy of a habitation maintained by the forestry service was deemed durable even though it could be terminated or modified on very short notice. The franchise to maintain amusement games in an airport was held in *Freeman* v. *County of Fresno, supra,* 126 Cal.App.3d 459 to be a possessory interest even though it could be terminated on 10 days' notice. Grazing permits revocable at will were found taxable in *Board of Supervisors* v. *Archer* (1971) 18 Cal.App.3d 717 [96 Cal.Rptr. 379]. In light of these authorities I would be hard pressed to say that landing rights at Lindbergh Field, which have been used over a long period of time and probably (in light of the stipulated facts of this case) could not arbitrarily be terminated, are not sufficiently "durable" to warrant taxation.

Similarly, it cannot be disputed that the right to use the landing strip is a benefit, that it is valuable, and that its value can no doubt be appraised on some reasonable basis.

The difficulty I have with classification of this use as a possessory interest is the requirement that the right be "exclusive." We of course know that the word "exclusive" in the property tax context does not carry the meaning it ordinarily exhibits. Grazing rights can be "exclusive" for property tax purposes even though they are held in common with other grazers on the same property. (*Board of Supervisors* v. *Archer, supra,* 18 Cal.App.3d 717.) City port facilities can constitute a sufficiently identifiable right of use to be taxable, even though they are used in common with others. (*Sea-Land Service, Inc.* v. *County of Alameda* (1974) 36 Cal.App.3d 837 [112 Cal.Rptr. 113].) The amusement machines placed by their owners on airport premises constituted an "exclusive" use of realty, even though competitors could be franchised to place machines on the same premises. (*Freeman* v. *County of Fresno, supra,* 126 Cal.App.3d 459.) The Cox company's cables used only a small linear space under pavement utilized for many other purposes by many other entities, and yet constituted sufficiently "exclusive" possession of realty. (*Cox Cable San Diego, Inc., supra,* 185 Cal.App.3d 368.)

Nevertheless, a use sufficient to permit property taxation must somehow be distinct, as compared to the use permitted the public in general. As

explained in *United States of America* v. *County of Fresno, supra,* 50 Cal.App.3d at page 638:

"To give rise to a taxable possessory interest, the right of possession or occupancy must be more than a naked possession or use; it must carry with it, either by express agreement or tacit understanding of the parties, the degree of *exclusiveness* necessary to give the occupier or user something more than a right in common with others, or, in the case of employment, something more than the means for performing his employer's purpose, so that it can be said, realistically, that the occupancy or use substantially subserves an independent, private interest of the user or occupier." (Italics in original.)

Hence, we understand that to be a "possessory interest" the right or power to conduct an activity on land must be in some way different from the right of use of everyone else on the same land. Since all people can traverse Telegraph Avenue for whatever purpose, the artist who occupies a corner with his painting easel exercises no special or "exclusive" activity.

In discussing this theme I must take issue with the position asserted in the lead opinion that when the use of public property is limited to a segment of the public the use of it by that spectrum becomes "exclusive" and taxable. Since only pilots can use the airport, the argument goes, and since pilots constitute only a small percentage of our populace, their use of it is by definition "exclusive."

This approach is in error, I believe, because the very nature of our current political concept of the use of public property is such as to restrict its use, in many cases, to certain specially equipped or licensed people. Only pilots may use airports, but in a similar vein only licensed drivers may use the freeways. To use an absurd example, only tennis players may use public tennis courts—but this cannot constitute them a segment of the public with "exclusive" rights. In our state courtroom only licensed lawyers are privileged to occupy space beyond the rail, and members of the Bar are undeniably a small and exclusive slice of society. Is this a logical approach to the concept of exclusivity? I think not.

I suggest that the idea of exclusivity envisaged in the definition of possessory interest is a right to use limited to specific members of a given class of otherwise qualified people. If only grazers of beef could come upon government land, we would to a considerable degree have identified a limited class of licensees—how many grazers of beef does any of us know, for instance? The class does not become exclusive, however, until the actual

licensees are a limited group drawn from the much larger class of grazers. In the river rafter case, to be discussed *infra*, the use of the river is exclusive because the class of river rafters entitled to use is limited and closed, thus excluding the whole world of river rafters and including only an exclusive group.

The use of the public airstrip by United Airlines and the other plaintiffs in this case is not exclusive because there is no limitation upon it. While the users have entered into a contract with the airport which regulates their use of the public airstrip, we know from the stipulated facts that, in accordance with federal regulations, no airline could be excluded. Not only is the class of commercial users open, but the airport can be used without limitation by the whole class of general aviation, which presumably includes every licensed person who can buy or rent a plane. In all of the cases we have cited above, the use in question—even though sometimes severely diluted by other activities on the same land—is in some way or degree an exclusive use. The holder of the use had a right, even though temporary or terminable, to exclude others of his same class from using the facility. Perhaps he could not exclude *all* others, but he belonged to a favored class.

It is this concept which precludes the taxation on real property tax theories of the use of the Coronado Bridge by tour buses—an example posed and discussed at oral argument. If use of a state-owned bridge by commercial carriers were restricted to a limited number of franchises, some sort of possessory interest subject to taxation would be created. When the bridge is open to all users, both commercial and private, I contend there is no exclusivity, and property taxation would be unauthorized. So it is, I believe, with the use of the landing strip at the airport.

The most difficult case to harmonize with this approach is *Scott-Free River Expeditions, Inc. v. County of El Dorado, supra*, 203 Cal.App.3d 896. The tax exempt property in this case was the South Fork of the American River—property of the State of California. Increasing use of the river for rafting (apparently all for pleasure rather than any cargo transport) resulted in control efforts by the County of El Dorado. Although private noncommercial rafting down the river continued uncontrolled, the county regulated commercial rafters by the issuance of permits. After a certain date no additional permits were issued, so that at the time the property taxability of the use was examined, the class of commercial users was limited and "exclusive." The Court of Appeal found that because permits had been limited, and because no commercial use of the river could be made without a permit, "it is obvious plaintiffs have something more than a right in common with others." (*Id.* at p. 910.) The fact that a large segment of users

(private rafters) was not regulated or excluded did not impair, the court held, the exclusive nature of the commercial users. Further, the fact that there were some 80 commercial users—which one might consider constitute a large class indeed—did not impair the nature of their "special right."

The *Scott-Free* authority refutes the argument of plaintiffs in our case insofar as such argument is based upon the fact that the airport is open to general aviation as well as commercial use. *Scott-Free* says that one can focus on the segment of use devoted to commerce, disregarding the fact that individuals may utilize the same ground for private nonprofit activities. This is an extension of the concept of stratified use of the same resource previously well established. The fact that the public may have free use of timber land or grazing land does not undermine the conclusion that the timber company or cattle grazing rancher has an exclusive prerogative. (*International Paper Co.* v. *County of Siskiyou* (9th Cir. 1974) 515 F.2d 285, 290; *El Tejon Cattle Co.* v. *County of San Diego* (1966) 64 Cal.2d 428 [250 Cal.Rptr. 504].)

*Scott-Free* carries this concept further, however, than any previous authority. In the timber and grazing cases the commercial user has an exclusive right to a particular asset on the land: the timber or the grass. In *Scott-Free* the private users are using the very same water, for the very same purpose, as are the commercial users. The premise of *Scott-Free*, therefore, is that one can view commercial use in a different light, or a different taxable compartment if you will, from private use. If within the special category of commercial use there is some restriction, and thus a creation of a favored class of users, a possessory interest can be recognized.

Adopting this analysis, there is no exclusivity and therefore no possessory interest in the use of the landing strip at Lindbergh Field. There is and can be no restriction of commercial use. No favored class exists. The only basis upon which one can differentiate the class of taxed users from the class of untaxed users is that the taxed people are commercial users. I do not believe this is a sufficient basis for claiming exclusivity. Not only is this distinction inaccurate, in my opinion, but in itself is flawed. It is common knowledge that a very large percentage of the "general aviation" at airports currently serving metropolitan areas is aviation engaged in commercial pursuits. We would assume that most of the "corporate" jets parked on the tarmac are operating in some way upon the basis of "ordinary and necessary" activities in connection with a business—to borrow a phrase from the Internal Revenue Code. These operations are not subject to tax; the only taxed aircraft are those transporting passengers or cargo for profit.

I therefore conclude that the category of activity carved out by this property tax assessment is not one which benefits from an exclusive right to

use, sufficient to support a determination that it is a taxable "possessory interest."

If this analysis is accepted, the imposition of tax fails because of construction of the state tax statute upon which it is premised, and there is no need to consider the several other grounds for invalidation asserted by the plaintiffs: grounds based upon federal statute or constitutional principles. This construction of the concept of "possessory interest" does lead, however, to the conclusion that the property tax sought in this case by the county is violative of one important federal prohibition—the Anti-Head Tax Act contained in 49 United States Code (1991 pocket supp.) appendix section 1513.

The lead opinion sets out appendix section 1513 of the United States Code in its entirety on page 429. As noted, the act precludes taxation based upon the number of persons transported or upon gross income. Subdivision (b) of appendix section 1513 contains two categories of exclusions from the terms of the act. The first category is broadly stated as "property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services." The second category of exclusion includes "reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities." In *City & County of Denver* v. *Continental Air Lines* (D.Colo. 1989) 712 F.Supp. 834, 840 it was held that this second category, which includes landing fees, permits taxation only to the extent the funds are used for airport operation and maintenance.

The lead opinion concludes that the Anti-Head Tax statute does not preclude the tax in this case because our tax is a "property tax," not a "landing fee," and hence falls within the first category of exclusion in United States Code, appendix section 1513, subdivision (b), which is not restricted to use for airport maintenance or improvements.

The difficulty with this argument is that the classification of a tax as property tax or not for purposes of the federal act is a matter of federal determination. In *Aloha Airlines, Inc.* v. *Director of Taxation* (1983) 464 U.S. 7 [78 L.Ed.2d 10, 104 S.Ct. 291], the United States Supreme Court found the Hawaii tax to be an invalid tax on gross income even though it was labeled, and had been found by the Hawaii courts to be, a property tax. Thus, in our case the classification of the tax on use of the landing strip, even though we might find it a "property tax" for state purposes, could well be determined for federal purposes to be either a gross income tax or a landing fee. Plaintiffs have introduced evidence showing a direct and highly correlative relationship between the tax in this case and the persons transported by the several plaintiff airlines. We do not know what the net income of the

several airlines is. The economics of the industry being what it is, however, we may be permitted to assume that the net income, if any, is undoubtedly not correlated to the gross income. Further, since the tax is computed upon the basis of landing fees, it is in effect another "landing fee" tax and hence in any event falls within the restriction of the second category of exception in United States Code, appendix section 1513, subdivision (b), since the tax proceeds are used by the county for its general purposes, not for airport maintenance or improvement. (See *City & County of Denver* v. *Continental Air Lines, supra,* 712 F.Supp. 834.)

Therefore, even if California law is stretched to the highly elastic extent necessary to find a "possessory interest" in the landing strip to be held by the airlines, I am convinced that this method of taxation is a "Head Tax" under federal law.

I would affirm the judgment of the trial court on the grounds that the exercise by the airlines of landing rights is not a "possessory interest" sufficient for imposition of property tax, and that the imposition of the tax in this case is precluded by the federal Anti-Head Tax statute.

A petition for a rehearing was denied December 24, 1991, and respondents' petition for review by the Supreme Court was denied March 12, 1992. Panelli, J., and Baxter, J., were of the opinion that the petition should be granted.